IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA


Feb 09 2021

IN THE MATTER OF THE SEARCH OF A
MOTOROLA CELLULAR TELEPHONE,
ASSIGNED **ATF ITEM: 000014**.

Case No. 3:21-MJ-00047-MMS

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION UNDER RULE 41 FOR A
## WARRANT TO SEARCH AND SEIZE

    **I,** R. Allen Adair, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND DETECTIVE BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the search of an **Motorola Cellular Telephone, seized and assigned ATF Item: 000014** and the seizure of evidence, instrumentalities, and fruits of violations of Title 18 U.S.C. §922(j), Title 18 U.S.C. §924(c)(1)(A), and Title 21 U.S.C. §841(a)(1).

2. I am a Police Officer employed by the Municipality of Anchorage Police Department and am presently a Commissioned Police Officer in the State of Alaska. Between May 2007 and April 2019, I was assigned to the Anchorage Police Department's (APD) Vice Unit. My assignment with the Vice Unit focused on investigations related to prostitution, human trafficking and trafficking of controlled substances.

3. I am a federal law enforcement officer within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure. In April 2019, I was assigned to a task force position with the Bureau of Alcohol, Tobacco, Firearms, and Explosives. My duties continue to focus on controlled substance and firearm related crimes impacting the Anchorage Community.



4.  I have more than twenty-five years of combined law enforcement experience. I was an explosive and drug detector dog handler with the United States Air Force from June 1991 to August 1996. In August 1996, I was credentialed as a Special Agent with the Air Force Office of Special Investigations. In August 2004, I left active duty with the military and was employed with the Anchorage Police Department as an Officer. I retired from the Air Force Office of Special Investigations in May 2011.

5.  I have graduated from three basic law enforcement academies. The first was the United States Air Force Police Academy in December, 1991. The second was the Air Force Office of Special Investigations Academy in November 1996 and the third was the APD Academy in January of 2005.

6.  During my tenure as a drug detector dog handler, I received training and instruction on devices, paraphernalia, techniques, and practices used by people engaged in the use, possession, and trafficking of controlled substances. This training also included the investigation of crimes involving the use, possession, and trafficking of controlled substances throughout the continental United States and military bases abroad.

7.  I attended and graduated from a six month special investigations academy operated by the Department of Defense. While attending this academy, I received training and instruction on devices, paraphernalia, techniques, and practices used by people engaged in the use, possession, manufacture, and trafficking of controlled substances. This training predominately focused on the investigation of crimes involving the use, possession, manufacture and trafficking of controlled substances and the means by which to infiltrate and/or identify individuals and organizations involved in the use, possession, manufacture and trafficking of controlled substances.

8.  I attended and graduated from a five month police academy operated by APD. While attending APD's academy, I received training and instruction on devices, paraphernalia, techniques, and practices used by people engaged in the use, possession, manufacture, and trafficking of controlled substances. In an extension of APD's academy, and subsequent to graduation from APD's academy, I received training and instruction from several APD field training officers.



This training included investigation of crimes involving the use, possession, manufacture, and trafficking of controlled substances in the Anchorage area.

9. The majority of my police experience has been as a Special Agent assigned to various Joint Drug Enforcement Teams in Texas, California, and Alaska, followed by my tenure with APD's Vice Unit. My duties include watching for illegal activities, interviewing witnesses, victims and suspects, developing probable cause for cases, examining crime scenes in order to develop evidence to substantiate or disprove the allegation being investigated, handling and processing various types of evidence, utilizing human sources of information to resolve drug and other criminal related investigations, and assembling cases for possible prosecution by Federal, State, Municipal and Military Judicial Offices. In my law enforcement career, I have conducted hundreds of drug related investigations, involving the use, possession, manufacture, and trafficking of marijuana, lysergic acid diethylamide (LSD) cocaine hydrochloride, cocaine base (crack), heroin, ecstasy (MDMA), psilocybin mushrooms, methamphetamine, controlled prescription medication While conducting these investigations, I have interviewed several hundred people, involved either directly or indirectly with the crimes being investigated. I have also served or assisted in serving several drug related search warrants resulting in the seizure of the above mentioned drugs as well as firearms, ammunition, packaging materials, assorted concealment containers, cutting agents, digital and beam scales, cellular telephones, surveillance systems, marijuana grow operations, methamphetamine laboratories, cameras, body armor, memory cards, computers and related equipment, various electronic equipment purchased with illicit proceeds, documents, money, precious metals, gems, stolen property, address books, and assorted paraphernalia utilized to ingest controlled substances.

10. Based on my training and experience, I know people involved in the use, possession, manufacture, and/or drug trafficking of controlled substances commonly possess and use cellular telephones, standard telephones, and computers to facilitate these activities. Regarding cellular telephones in particular, I know drug traffickers will use cellular telephones to facilitate their activities because of the mobility offered by cellular telephones. Further, drug traffickers are attracted to cellular telephones because they enable suspects to avoid the risks


attendant with operating from a fixed location. Additionally, cellular telephones afford spontaneous access to drug customers and to drug sources.

11. It is common for members of drug trafficking organizations, in an attempt to disguise their identities and illegal activities, to use pre-paid cellular telephones and pre-paid long distance calling cards. I know that often times the only way to connect a subject with a particular pre-paid cellular telephone or calling card is to seize the phone or calling card from the trafficker or his residence. The aforementioned items are maintained in locations to which dealers of illegal controlled substances have ready access, such as within their residences and the surrounding curtilage; their vehicles; the residences of family members, friends and associates; the places in which they conduct their drug distribution activities; such as stash houses or safe houses; in business locations with which the trafficker is associated; or in storage areas.

12. It is common for members of drug trafficking organizations to maintain telephonic/text message/messenger communications before, during and after drug transactions. Calls and/or text messages are often made between the drug source of supply and the drug recipient, prior to departure of a drug courier and upon arrival of a drug courier at the destination. Once at the destination, it is common for the courier to contact the recipient, via the telephone. Records of such contacts, whether call logs or text messages, are frequently maintained in the cellular telephone's memory.

13. It is common for individuals involved in drug trafficking to use multiple cellular telephones to maintain contact with their associates. These individuals use multiple cellular telephones because cellular telephones are mobile and can be easily obtained with a different subscriber name. Members of a drug trafficking organizations, to thwart law enforcement detection of their illicit drug trafficking activities, often use a different subscriber name and/or telephone number. These different telephone numbers often have different subscriber names and/or are pre-paid cellular telephones where the subscriber is difficult to determine. Because several different telephone numbers may be used, it is common for traffickers of controlled substances to maintain the names and telephone numbers of associates within the cellular telephone memory. These associate names and telephone numbers may be stored in historical call logs, text-messaging history or within the contacts section of the cellular telephone.



14. It is common for members of drug trafficking organizations to take or cause to be taken, photographs and/or videos of themselves and their co-conspirators and associates.  It is also common for members of drug trafficking organizations to take or cause to be taken, photographs and/or videos of themselves and/or their co-conspirators with controlled substances, large sums of money, guns and expensive assets (i.e. jewelry, luxury cars).  The aforementioned images are frequently maintained in the memory of cellular telephone devices.  Devices such as smart cellular telephones often imprint each photo with the GPS coordinates where such photos are taken.  Thus, it is possible to discern the location of stash houses and other evidence by analyzing a digital photo.

15. Certain cellular telephones have a feature which allow the subscriber or user of the device remote access to "wipe" or delete all the information if the device no longer in their possession whether it be because it is lost, stolen, or seized.

16. I received an associate in applied science, criminal justice degree from the Community College of the Air Force in 2004.  I have attended the following courses to supplement training I received while attending the previously mentioned law enforcement academies:

 (i)   Department of Justice Operation Jetway Course, July 2018
 (ii)   DEA Social Media for Investigation Course, April 2018
 (iii)   FLETC Single Officer Response to an Active Threat, June 2018
 (iv)   DEA Social Media for Investigation Course, July 2014
 (v)   DEA Narcotic Management and Leadership Course, October 2012
 (vi)   DEA Prescription Drug Diversion Investigations Course, August 2012
 (vii)   DEA Drug Interdiction Course, September 2011
 (viii)   Investigating Drug Trafficking Organizations Course, August 2011
 (ix)   DEA Basic Drug Investigations Course, August 2010
 (x)   Mid-Level Narcotic Investigation Course, June 2010
 (xi)   DEA Indoor Marijuana Cultivation Investigations Course, July 2008
 (xii)   International Money Laundering Investigations, July 2008
 (xiii)   National Center for Missing and Exploited Children, Protecting Victims of Child Prostitution, January 2008
 (xiv)   DEA Controlled Substance Concealment Course, January 2008
 (xv)   Anchorage Police Department Crime Scene Processing Course, November 2004
 (xvi)   Anchorage Police Department Patrol Officer Academy, August 2004
 (xvii)   DoD Polygraph Institute Credibility Assessment through Linguistic Analysis, April 2002
 (xviii)   Heinz Laboratories National Clandestine Drug Labs Course, January 2001


(xix)     AFOSI Protective Service Operation Course, August 2000

(xx)      USMC Urban/Rural Sniper/Counter-Sniper Training, January 2000

(xxi)     AFOSI Counterintelligence and Force Protection Operations Course, November 1999

(xxii)    AFOSI Evidence Custodian Training Course, May 1999

(xxiii)   Practical Homicide Investigation Course, February 1999

(xxiv)    Advanced Reid Technique of Interviewing and Interrogation, July 1998

(xxv)     AFOSI Advanced Special Investigators Course, July 1998

(xxvi)    AFOSI Forensics Course, October 1997

(xxvii)   AFOSI Special Investigators Course, December 1996

(xxviii)  Reid Technique of Interviewing and Interrogation, October 1996

(xxix)    Investigative Skills for Street Gangs, March 1996

(xxx)     Texas A & M Investigative Skills Course, November 1995

(xxxi)    USAF Explosive and Drug Detector Dog Handler Course, March 1992

(xxxii)   USAF Patrol Dog Handler Course, October 1991

(xxxiii)  USAF Law Enforcement Specialist Course, September 1991


## **TECHNICAL TERMS**

17. Based on my training, and experience, I know cellular telephones and other electronic devices often have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, PDA, and to access the Internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

18. Based on my training and experience, I use the above technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending,


receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications

Page 7 | 20


that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. Computer: a computer as used herein is defined in 18 U.S.C. § 1030(e)(1), and includes an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.

f. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, which is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

h. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between



devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

i. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

19. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

20. There is probable cause to believe that things that were once stored on the Device may still be stored there, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active


Feb 09 2021

file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

21. *Forensic evidence.* As further described in Attachment A, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic



Feb 09 2021

evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

22. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

23. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## LOCATION AND DEVICE ASSOCIATED WITH THIS REQUEST

24. The cellular telephone referenced in this Affidavit is described as a **Motorola Cellular Telephone, seized and assigned ATF Item: 000014**. This item is currently located within ATF's Evidence Vault, located at 222 W. 7th Street, Anchorage, Alaska.

## LIMITED NATURE OF AFFIDAVIT

25. I have participated in the investigation of the offenses set forth above. The facts and information contained in this affidavit are based upon my personal knowledge, information obtained from local law enforcement officers and information obtained from the analysis of



reports. All observations referenced in this affidavit that were not made by me were related to me by the person who made such observations. Unless specifically indicated, all conversations and statements described in this affidavit are related in substance and in part only and are not intended to be a verbatim recitation of such statements. I have not set forth each and every fact learned during the course of this investigation. I have set forth only those facts which establish the foundation for probable cause.

## PROBABLE CAUSE

### *May 28, 2020 – APD Case #20-16503 (Misconduct Involving Weapon - Shots Fired)*

26.    On May 28, 2020, Anchorage Police Department (APD) Officers responded to the area of Core Court and Molanary Drive following reports of shots fired. Initial investigation of this incident determined that three suspects fired at least 15 rounds towards three individuals who were in and around a parked SUV at the end of the cul-de-sac on Core Court. Three vehicles and one residence were struck by the gunfire. Following the shooting, multiple witnesses reported seeing three suspects running away from the scene. The suspects ran between 3701 and 3711 Core Court and left the area in two vehicles parked alongside 3701 Core Court. Investigation identified one of the suspect vehicles as a silver 2012 Chevrolet Malibu with Alaska license plates JKN972. Alaska Department of Motor Vehicles records report this vehicle as registered to Andre Samaniego.

27.    APD Officers located and recovered a total of 15 fired cartridge casings consisting of 9mm and .45 caliber. The fired cartridge casings recovered by APD Officers during the course of this investigation were examined and entered into the NIBIN database for possible matching.

### *June 05, 2020 – APD Case #20-17390 (Stolen Vehicle and Assault)*

28.    On June 5, 2020, Andre Samaniego was a passenger in a vehicle when she saw her silver 2012 Chevrolet Malibu with Alaska license plates JKN972, in the drive-thru of Raising Cane's restaurant (849 E Dimond Boulevard, Anchorage, AK). Samaniego's vehicle began following the Chevrolet Malibu. While following the vehicle, Samaniego stated that the front passenger stuck his head out the window and pointed a black pistol towards her. At this time, Samaniego became



fearful and stopped following the vehicle. Samaniego described the front passenger as a light-skinned black male who appeared to be less than 20 years old with a shaved head on the sides and approximately 1-2" of hair on top.

29.     Following the altercation, Samaniego contacted APD to report the incident. Samaniego reported that her vehicle had been stolen sometime in mid-February 2020, however, due to a misunderstanding the vehicle was never reported stolen. Samaniego explained that the vehicle had been scheduled for repossession, but the vehicle was stolen before it could be repossessed. After confirming that the vehicle had not been previously entered as stolen, APD dispatch entered the vehicle as stolen on June 05, 2020.

### June 07, 2020 – APD Case #20-17390 (Recovery of Stolen Vehicle and Stolen Firearm)

30.     On June 07, 2020, at approximately 1430 hours, an APD Officer located Samaniego's stolen vehicle backed into a parking spot in the parking lot of Lions Park. The Officer made contact with the occupants of the vehicle, later identified as Damarcus Rashad GIBBS (driver), Xzavion Anthony RICHARDS (front passenger) and Rajiem DEMINGS (rear passenger side). During initial contact with GIBBS, he said something similar to, "this car isn't stolen?" When the Officer told GIBBS that the vehicle was stolen GIBBS started to rant about how he bought a stolen car. GIBBS stated that he should have known and added that he only owed $300 more for the vehicle.

31.     After taking all of the occupants into custody, Officers approached the stolen vehicle and observed a brown and black grip of a firearm sticking out from under the driver's seat. The firearm was recovered from under the seat and identified as a: Remington 1911R1 .45 caliber pistol, serial number: RHH036738. This firearm was reported stolen to APD (Case #18-2655) on January 18, 2018 and assigned APD Evidence Tag: 1233791. Also located under the driver's seat was marijuana, a scale and drug packaging.

32.     All occupants of the vehicle were transported to APD to be interviewed. Before beginning the interview with GIBBS, an APD Detective read GIBBS his Miranda rights. GIBBS stated that he understood his rights and agreed to speak with Detectives. During the interview with GIBBS, he stated that he bought the vehicle for $1,000 from a man he knows as "Bobby." GIBBS showed


Detectives a Snapchat conversation on his phone in an effort to corroborate his statements. The conversation indicated paying $1,000 for the Malibu. The conversation also detailed GIBBS explaining that he was going to sell "the gun" for $600 to give to "Bobby." After initial denials regarding the firearm recovered from the vehicle, GIBBS admitted to buying the firearm from someone in Mt. View for $500. GIBBS further acknowledged that he knew the firearm was stolen and estimated that it was loaded with 6 rounds of ammunition. GIBBS informed Detectives that he bought the firearm for protection because someone had been following him and yelling at him. GIBBS stated that the marijuana and scale recovered from the vehicle also belonged to him. GIBBS acknowledged selling marijuana to friends and utilizing the scale so that he would not have to "eyeball it" and give them too much. GIBBS also stated that he mostly possessed the marijuana to smoke.

33.     During the interviews of RICHARDS and DEMINGS, both initially denied knowing about the firearm in the vehicle before acknowledging that they knew it was in the vehicle and they had previously handled it. Neither RICHARDS nor DEMINGS claimed ownership of the firearm.

34.     The stolen firearm possessed by GIBBS was test-fired and entered into the NIBIN database for possible matching. On June 19, 2020, upon examination of APD submissions of ballistic evidence to the NIBIN database, the ATF NNCTC generated a NIBIN Lead notification that was later designated as NIBIN Lead 20-037. A review of NIBIN Lead 20-037 presumptively indicates that the stolen Remington 1911R1 .45 caliber pistol possessed by GIBBS on June 07, 2020, was presumptively linked to .45 caliber fired cartridge casings collected from the crime scene of a shooting on May 28, 2020. On November 23, 2020, I provided ATF Special Agent (SA) Sarah Foreman, an interstate nexus examiner, with the following firearm information: Remington 1911R1 .45 caliber pistol, serial number: RHH036738. Based upon the firearm information provided to SA Foreman, it was determined that the stolen firearm possessed by GIBBS was not manufactured in the State of Alaska and has therefore traveled in or affected interstate commerce

***November 24th, 2020 – APD Case #20-37038 (Agency Assist and Warrant Service)***

35.     On November 24th, 2020, I contacted and arrested GIBBS at the Anchorage Pre-Trial Office, located at 619 E. Ship Creek Road. The arrest warrant was issued by U.S. Magistrate Judge



Deborah Smith for violations of Title 18 U.S.C. §922(j). I observed GIBBS arrive for his pre-trial appointment in a silver 1997 Jeep Cherokee, Alaska License: DSA960. GIBBS was operating the Jeep and he was accompanied by Terryonn Parker. The duo were contacted after entering the pre-trial office. APD Officers and other investigators remained with the Jeep, pending an interview of GIBBS. The APD Case assigned for this assistance was 20-37038. GIBBS was in possession of the Jeep keys, $625, and an Apple iPhone (APD Evidence Tag: 1234570) at the time of his arrest.

36. During a mirandized interview, GIBBS stated the May 28th, 2020 incident documented in APD Case: 20-16503 stemmed from Carlos De La Cruz RODRIGUEZ shooting at Versace Armani SPERL. GIBBS received a telephone call from SPERL after RODRIGUEZ fired at him. GIBBS stated he was passing Smoke King on Mt View Drive when SPERL told him about RODRIGUEZ shooting at him. GIBBS and his associates followed RODRIGUEZ to Core Court and shot at RODRIGUEZ.

37. GIBBS admitted Investigators would locate another firearm and approximately 65 blue fentanyl laced tablets in his backpack in the rear passenger seat of the vehicle. GIBBS admitted to possessing the firearm and tablets, "So I won't get shot and then so I can make my money…" GIBBS described the pistol in his backpack was a Glock .45 caliber and he denied it was involved in any shooting incidents. At the conclusion of the interview, I requested Officers impound the silver 1997 Jeep Cherokee, Alaska License: DSA960 to APD's indoor secured storage area pending application of a search warrant. On December 1st, 2020, I examined the exterior of the silver 1997 Jeep Cherokee, Alaska License: DSA960 at APD's indoor secured area. I observed a second cellular telephone on the front passenger seat and a black backpack in the right rear passenger seat bearing the imprint "Santa Cruz". I believe this to be the backpack referenced by GIBBS.

38. On December 2nd, 2020, I petitioned for and received a search warrant issued by U.S. Magistrate Judge Deborah Smith. The warrant number was 3:20-mj-00571-DMS and authorized the search of GIBBS' silver 1997 Jeep Cherokee, Alaska License: DSA960 and the seizure of firearms, controlled substances, currency, personal electronics, and records/documents. SA Borgeson and I executed the warrant the following day. A **Motorola cellular telephone** was

 Feb 09 2021

seized from the front passenger seat area. It was assigned **ATF Item: 000014**. The backpack described by GIBBS was located in the right rear passenger seat.

a.      The smaller front zippered pocket of the backpack contained a small amount of marijuana and assorted documents/cards related to Demarcus GIBBS.

b.      The zippered, main compartment of the backpack contained a loaded Glock, Model 21, .45 caliber pistol, Serial Number: AEEM191. The magazine contained eleven additional rounds. A digital scale, plastic baggies, and a pair of scissors was seized from the main compartment. I located the blue tablets described by GIBBS. They were separated in two plastic baggies and concealed in what appeared to be a legitimate prescription bottle for GIBBS. The above listed items were transported from APD's indoor secured storage area to the ATF property vault.

39.      The Glock pistol recovered in paragraph 13b was test-fired and entered into the NIBIN database for possible matching. Upon examination of APD submissions of ballistic evidence to the NIBIN database, the ATF NNCTC generated a NIBIN Lead notification presumptively indicates this firearm was also linked to fired cartridge casings collected from the crime scene of a shooting on May 28, 2020.

## CONCLUSION

8. Based upon my training and experience, I know that pursuant to Title 18 U.S.C. §922(j) that it is unlawful for any person to receive, possess, conceal, store, barter, sell, or dispose of any stolen firearm or stolen ammunition, or pledge or accept as security for a loan any stolen firearm or stolen ammunition, which is moving as, which is a part of, which constitutes, or which has been shipped or transported in, interstate or foreign commerce, either before or after it was stolen, knowing or having reasonable cause to believe that the firearm or ammunition was stolen; Title 21 U.S.C. §841(a) states that it shall be unlawful for any person knowingly or intentionally to



manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense a controlled substance. I also know that pursuant to Title 18 U.S.C. §924(c)(1)(A) it is unlawful for any person during and in relation to a drug trafficking crime to use or carry a firearm in furtherance of any such crime.

9. Based upon the aforementioned information, I believe that probable cause exists that the **Motorola Cellular Telephone, seized and assigned ATF Item: 000014**, contains evidence, instrumentalities, and fruits of violations of Title 18 U.S.C. §922(j), Title 18 U.S.C. §924(c)(1)(A), and Title 21 U.S.C. §841(a)(1).

10. Based on the foregoing, your affiant is requesting that a search warrant be granted for the **Motorola Cellular Telephone, seized and assigned ATF Item: 000014**, referenced in this affidavit (**Attachment A**) and there is probable cause to believe **Damarcus Rashad GIBBS** is in violation of Title 18 U.S.C. §922(j), Title 18 U.S.C. §924(c)(1)(A), and Title 21 U.S.C. §841(a)(1).

11. Specifically, I request authorization to search for, and seize, the items listed in **Attachment B**.

Respectfully submitted,

R. Allen Adair
Detective, Bureau of Alcohol, Tobacco, Firearms and Explosives / Anchorage Police Department Task Force

Subscribed digitally and sworn to telephonically on February 9, 2021

Matthew M. Scoble, United States Magistrate Judge